```
                    IN THE UNITED STATES DISTRICT COURT
                   FOR THE NORTHERN DISTRICT OF TEXAS
                             DALLAS DIVISION

UNITED STATES OF AMERICA,    )   Case No. 3:19-CR-00349-K-1
                             )
          Plaintiff,         )
                             )   Dallas, Texas
v.                           )   September 10, 2019
                             )   1:00 p.m.
ROMELIO RIVERON,             )
                             )   DETENTION HEARING
          Defendant.         )
_____)
```

```
                     TRANSCRIPT OF PROCEEDINGS
             BEFORE THE HONORABLE REBECCA RUTHERFORD,
                  UNITED STATES MAGISTRATE JUDGE.
```

APPEARANCES:

| | |
|---|---|
| For the Government: | Gary Tromblay<br>UNITED STATES ATTORNEY'S OFFICE<br>1100 Commerce Street, Suite 300<br>Dallas, TX  75242-1699<br>(214) 659-8600 |
| For the Defendant: | Brian D. Poe<br>BRIAN D. POE, ATTORNEY AT LAW,<br>  PLLC<br>The Bryce Building<br>909 Throckmorton Street<br>Fort Worth, TX  76102<br>(817) 870-2022 |
| Recorded by: | Lavenia Price<br>UNITED STATES DISTRICT COURT<br>1100 Commerce Street, Room 1452<br>Dallas, TX  75242-1003<br>(214) 753-2168 |
| Transcribed by: | Kathy Rehling<br>311 Paradise Cove<br>Shady Shores, TX  76208<br>(972) 786-3063 |

```
        Proceedings recorded by electronic sound recording;
           transcript produced by transcription service.
```

<u>DALLAS, TEXAS - SEPTEMBER 10, 2019 - 1:29 P.M.</u>

1

2        THE COURT:  And our next case is United States of

3  America versus Romelio Riveron, which is Case 3:19-CR-349-K.

4        MR. TROMBLAY:  Gary Tromblay for the Government.

5        MR. POE:  Brian Poe for Mr. Riveron.

6        THE COURT:  We are here for a hearing on the

7  Government's motion for detention.  Is the Government ready to

8  proceed?

9        MR. TROMBLAY:  We are.

10        THE COURT:  Is the Defense ready?

11        MR. POE:  Yes, Your Honor.

12        THE COURT:  All right.  Go ahead, Mr. Tromblay.

13        MR. TROMBLAY:  Yes.  The Government is going to call

14  Special Agent Dan Gimenez with the FBI.

15        THE COURT:  I'm going to put you under oath.

16         DANIEL GIMENEZ, GOVERNMENT'S WITNESS, SWORN

17        THE COURT:  Thank you.  Please have a seat.

18                    DIRECT EXAMINATION

19  BY MR. TROMBLAY:

20  Q   Special Agent Gimenez, would you identify yourself for the

21  record, please?

22  A   My name is Daniel Gimenez.  I'm a special agent for the

23  FBI.

24  Q   Okay.  And how long have you been an employee with the

25  FBI?

Gimenez - Direct                    3

1    A    Five years.

2    Q    Okay.  And what is your current job assignment with the

3    FBI?

4    A    Assigned -- I'm a special agent assigned to the Violent

5    Crimes Task Force, Dallas Division, of the FBI.

6    Q    Okay.  Are you, in fact, the case agent or co-case agent

7    on the case of United States of America versus Romelio

8    Riveron?

9    A    I am.

10   Q    Okay.  And there has been a one-count indictment charging

11   the Defendant with conspiracy to commit money laundering.

12   A    Yes.

13   Q    And are you familiar with the contents of that indictment?

14   A    Yes.

15   Q    And the allegations that support it?

16   A    Yes.

17   Q    Okay.  Give us a little bit of background.  How did this

18   case come -- how did this -- how did Mr. Riveron come into the

19   -- come to the attention of the FBI in Dallas?

20   A    The Dallas Division of the FBI opened an investigation on

21   or about September of 2015 regarding the violent robberies of

22   traveling jewelry salesmen throughout the United States.  The

23   robberies -- throughout the investigation, the robberies --

24   we've come to know that the robberies were committed by a

25   criminal enterprise that consisted of mostly Columbian

1    nationals whose members and associates would target traveling

2    jewelry salesmen throughout the U.S., obtain fraudulent

3    identification documents to obtain bank accounts to support

4    their crimes.  They would commit a high-risk robbery or theft

5    -- in our case, they were all robberies -- and then they would

6    contact buyers, a very few known buyers that they've known for

7    years that would buy the stolen jewelry and diamonds.

8    Q    Okay.  When you say buyers, have you ever heard the term

9    "fence"?

10   A    Yes.

11   Q    What does "fence" mean?

12   A    Is a buyer of stolen property.

13   Q    Okay.  Now, in total in this investigation, how many

14   robbers themselves -- that is, the actual participants in the

15   robberies -- were indicted in the Dallas Division of the

16   Northern District of Texas?

17   A    Twenty.

18   Q    Okay.  And approximately how many fences were indicted?

19   A    Indicted?

20   Q    Yes.

21   A    Three.  One --

22   Q    And is Mr. Riveron one of those?

23   A    Yes.

24   Q    Do you see him in the courtroom today?

25   A    Yes.

1    Q    Can you identify him for the record?

2    A    He's sitting in a jumpsuit at the desk next to Mr. Brian

3    Poe.

4              MR. TROMBLAY:  Your Honor, let the record reflect

5    that the witness has identified the Defendant, Mr. Riveron.

6              THE COURT:  It will.

7              MR. TROMBLAY:  Okay.

8    BY MR. TROMBLAY:

9    Q    Now, in the indictment, it's alleged that Mr. Riveron was

10   the fence relating to four separate robberies; is that

11   correct?

12   A    Yes.

13   Q    Okay.  Tell us about the -- by the way, what's his

14   nickname?

15   A    He's known to the robbers as Kitty.

16   Q    Okay.  Did he have a cell phone that he would use to be in

17   contact with the robbers concerning the purchase of the fruits

18   of these robberies?

19   A    Yes.

20   Q    Okay.  And was that cell phone number, was that in his

21   name?

22   A    Yes.

23   Q    Okay.  And is there evidence that ties him to it as well?

24   A    Yes.

25   Q    Okay.  The first robbery in the indictment describes a

1    robbery that happened in Bedford, Texas on August 19th of

2    2014.  What happened with that robbery?

3    A    Robbers identified a traveling jewelry salesman while

4    conducting surveillance in the Dallas area.  They followed

5    that individual to a Pep Boys parking lot located in Bedford,

6    Texas.  They robbed that individual at gunpoint, at what the

7    victim believed was gunpoint, of his jewelry line, and fled

8    the scene and took the jewelry line to Houston.

9    Q    Okay.  Were the robbers from Houston, from the Houston

10   area?

11   A    Most of them were, to our knowledge.

12   Q    Okay.  Now, at some point in time, did Mr. Riveron get in

13   contact with these people?

14   A    Yes.

15   Q    Okay.

16   A    One of the robbers contacted Mr. Riveron.

17   Q    Okay.  How did he contact him?

18   A    Telephonically.

19   Q    Okay.  And where does Mr. Riveron reside?

20   A    The Miami, Florida area.

21   Q    Okay.  And did Mr. Riveron travel from the Miami area to

22   Houston after that contact?

23   A    Yes.

24   Q    Okay.  When did he travel?

25   A    In or about August 26th or 25th, 2014.

1    Q    Okay.  And how did he travel?

2    A    By airplane.  Airline.

3    Q    Okay.  And eventually did one of the robbers cooperate and

4    identify him as being the person who actually purchased the

5    stolen jewelry from them?

6    A    Yes.

7    Q    Okay.  And did he identify him by both nickname and also

8    by photographic identification?

9    A    Yes.

10   Q    Okay.  And what evidence do you have to corroborate that

11   Mr. Riveron did, in fact, travel from the Miami area to

12   Houston shortly after the robbery?

13   A    We have statements from his credit card that he purchased

14   the airline travel to and from -- to Houston from Miami and

15   then also back to Houston from Miami within -- a 96-hour

16   period is the entire period.  There are testimony of

17   cooperating defense.  There is hotel stay record in Houston.

18   Q    Let me ask you that.  Did the robber who's cooperating,

19   who identified him, did he say specifically at which hotel he

20   met with Mr. Riveron in order for him to purchase the stolen

21   jewelry?

22   A    Yes.  It was the Ramada near the Houston International --

23   InterContinental Airport.

24   Q    And, in fact, did you determine whether or not Mr.

25   Riveron, in fact, stayed at that hotel on or about August 25th

1   through the 26th?

2   A    Yes.  There is a record folio for guest stay under his

3   name and address for which he, I believe, paid cash.

4   Q    Okay.  Are there any cell phone tower records that would

5   corroborate the account of the person who participated in the

6   robbery who ultimately sold him stolen jewelry?

7   A    No cell phone records for the robberies.

8   Q    Okay.

9   A    On that.

10  Q    Okay.  And by the way, do you remember the approximate

11  loss amount?

12  A    Approximately between $300,000 and $500,000.

13  Q    Okay.  And how much did Mr. Riveron pay the robbers for

14  that stolen jewelry?

15  A    Over $100,000.

16  Q    So he got a significant discount, correct?

17  A    Correct.

18  Q    Let's talk about the second robbery, the one that's

19  alleged to have occurred in the Oklahoma City area.  Do you

20  recall that one?

21  A    Yes.

22  Q    The one that occurred on September the 26th of 2014.  What

23  happened in that case?

24  A    In the same fashion, as their mode of operation, the

25  robbers targeted a jewelry store to identify a traveling

1   jewelry salesman.  They followed an individual who they

2   believed was a traveling jewelry salesman to several locations

3   -- namely, a jewelry store -- and robbed him in the parking

4   lot to or from his vehicle in the same fashion at knife- or

5   gunpoint with a dangerous weapon.  Flattened his tire, stole

6   his jewelry line worth approximately $614,000, and fled the

7   area to a hotel nearby.

8   Q    Okay.  And did any of the participants in this robbery,

9   after that robbery, contact Mr. Riveron?

10  A    Yes.

11  Q    How did they contact him?

12  A    Telephonically.

13  Q    Okay.  And there are records for that that support it?

14  A    Not for the contact.  That's through a statement provided

15  by the cooperating defendant.

16  Q    Okay.  But in any event, is there any evidence that,

17  immediately after that robbery, that Mr. Riveron traveled from

18  the Miami area to the Oklahoma City?

19  A    Yes.  As in the last robbery we just spoke of in Bedford,

20  his phone usage used towers consistent with the location of

21  the meeting in Oklahoma City, along with the Bedford area, the

22  one we spoke of prior.

23  Q    What about flight records?  Did flight records indicate

24  that the day following the robbery -- specifically, that on

25  September the 27th -- that he flew from Miami to Dallas?

1    A    Yes.

2    Q    Okay.  And once in Dallas, where did he stay?

3    A    He stayed at the Omni Hotel.

4    Q    Okay.  And the following day, what did he do?

5    A    He traveled -- him and his then-spouse traveled from the

6    Dallas/Fort Worth Airport to the Oklahoma City International

7    Airport.

8    Q    And where did he stay in there?

9    A    The Colcord Hotel in Oklahoma City, downtown Oklahoma

10   City.

11   Q    And you said that he traveled with his wife.  Do you

12   recall his wife's name?

13   A    Yes.  Ms. Sandra Diaz Canto at the time.

14   Q    Okay.

15   A    And right now I believe she's Ms. Sandra Diaz Riveron.

16   Q    Is she in the courtroom today?

17   A    She is.

18   Q    Can you identify her, please?

19   A    She is the lady sitting -- raising her hand right now.

20   Thank you.

21   Q    Okay.  Did one of the robbers -- was there cell phone

22   towers records that confirmed that one of the robbers' cell

23   phones was also utilizing the same cell tower that Mr.

24   Riveron's cell phone was using at the alleged time of the

25   meeting for the exchange?

1    A    Yes.  Cell phone tower consistent with the same location.

2    Q    Okay.  And following that, did Mr. Riveron make any

3    shipments from Oklahoma City to the Miami area?

4    A    There is a shipment record in his credit card statement

5    that cleared on August -- excuse me, on October 1st of 2014,

6    which is the day after his departure from the Oklahoma City

7    area.

8    Q    Okay.  And he traveled --

9    A    A FedEx record.

10   Q    And he traveled from Oklahoma City to Miami via airline,

11   correct?

12   A    Correct.  By way of Dallas.

13   Q    Okay.  And is your belief that he had the jewelry that was

14   -- that he purchased shipped back by the carrier?

15   A    At this point, it's unknown what he did with the jewelry.

16   Q    Okay.  Fair enough.  Let's talk about the October 30th,

17   2014 robbery that occurred in Charlotte, North Carolina.  What

18   was the loss amount in that one?

19   A    Approximately $300,000 to $500,000.

20   Q    Okay.  And how did that robbery happen?

21   A    In the same fashion and mode of operation of the previous

22   two robberies.  Robbers traveled to the Charlotte, North

23   Carolina area to target jewelry store area and center to

24   identify a traveling jewelry salesman.  Once they believed

25   they observed a traveling jewelry salesman, they followed that

1    individual to a gas station and conducted a robbery in the

2    same fashion, at knife or gunpoint, flattened a tire of the

3    victim, the victim's car.  In this occasion, a nearby witness

4    observed the robbery occur, drew his private pistol, and fired

5    shots at the robber as they fled the scene.

6    Q    Okay.  Did any of the robbers cooperate --

7    A    Yes.

8    Q    -- following their indictment?  Did they indicate who they

9    contacted after the robbery in order to sell the jewelry?

10   A    Yes.  They contacted Mr. Riveron.

11   Q    And did Mr. Riveron, according to them, take them up on

12   the offer?

13   A    Yes.

14   Q    Okay.  Any evidence that he traveled from the Miami area

15   to Charlotte, North Carolina?

16   A    Yes.  There's evidence that he traveled by land, possibly

17   driving there.

18   Q    Okay.  Where did he stay at once in Charlotte, North

19   Carolina?

20   A    He stayed at the Hilton Charlotte City Center, downtown

21   Charlotte, North Carolina.

22   Q    Okay.  And is there cell phone tower records to indicate

23   that any of the robbers who identified him as being the fence,

24   that they were also using the same cell tower as the one that

25   Mr. Riveron's cell phone was using at the time of the

1   exchange?

2   A    There is record of a robber that used the same cell phone

3   number in the previous robbery in Oklahoma City, --

4   Q    Okay.

5   A    -- was used in the Charlotte, North Carolina robbery, and

6   that robber's cell phone tower usage, that device was

7   consistent with the same location as the device of Mr. Riveron

8   that's described under his name, consistent with the same day

9   of the meeting in the Charlotte City Center Hotel.

10  Q    Okay.  Let's talk briefly about the July 15th, 2015

11  robbery that occurred in Houston, Texas.

12  A    Okay.

13  Q    What happened with that robbery?

14  A    The robbers traveled to the Houston, Texas area to

15  identify a traveling jewelry salesman.  Identified someone who

16  they believed was a traveling jewelry or diamond salesman.

17  Followed him to a highway near the airport and robbed him on a

18  feeder road of a highway near the Houston InterContinental

19  Airport in the same fashion.  Done at knifepoint, smashing his

20  window, flattening his tire.  They stole over $1 million worth

21  of GIA-certified diamonds.

22  Q    Okay.  Any of these robbers cooperate?

23  A    Yes.

24  Q    And did they indicate who they first contacted after this

25  robbery in order to fence the stolen diamonds?

```
1    A    They did indicate who they first contacted.

2    Q    Who did they first contact?

3    A    Mr. Elkin Acosta.

4    Q    Okay.  And has he been indicted?

5    A    Yes.

6    Q    And what's the status of his case?

7    A    Mr. Acosta has since pled guilty --

8    Q    Okay.

9    A    -- and is awaiting sentencing.  He was indicted for

10   similar offenses related to Mr. Riveron.

11   Q    Okay.  He's also indicted for money laundering?

12   A    Yes, sir.

13   Q    Okay.  After Mr. Acosta, did he -- did Acosta buy the

14   diamonds?

15   A    No.

16   Q    Okay.  And after Mr. Acosta, who has since pled guilty,

17   refused to buy the diamonds, who did they then contact?

18   A    Mr. -- at some point, they contacted Mr. Romelio Riveron.

19   Q    Okay.  And is there evidence that Mr. Riveron traveled

20   from the Miami area to Houston?

21   A    Yes.

22   Q    Okay.  What does that evidence consist of?

23   A    Cell phone tower usage indicating he traveled by land.

24   Stopped at several locations to purchase gas with a credit

25   card record that we have obtained indicates.  There's also an
```

1   interview of Mr. George Diaz after Mr. Riveron was arrested,

2   also admitted taking him to Houston.

3   Q    Okay.  I'm going to come back to Mr. Diaz in a second, but

4   did the robbers indicate specifically where they met with Mr.

5   Riveron in order to conduct the exchange?

6   A    Yes.  At a hotel near -- I'm sorry.  Strike that.  They

7   picked up Mr. Riveron at a LaQuinta Hotel and took him to an

8   apartment where they had a short-term lease secured under

9   fraudulent identification documents.

10  Q    Okay.  And did you check to see whether or not -- were

11  they able to identify specifically which LaQuinta Inn?

12  A    Yes.

13  Q    Okay.

14  A    Yeah.

15  Q    And were you able to determine whether or not Mr. Riveron

16  had, indeed, rented a hotel room at this -- during this time

17  period?

18  A    The hotel room was not in Mr. Riveron's name.  It was

19  under the name of George Diaz and his Hialeah address.

20  Q    Okay.  And who is George Diaz as it relates to this

21  Defendant?

22  A    George Diaz is the brother of Ms. Sandra Diaz Riveron.

23  Q    So, basically, George Diaz is his brother-in-law?

24  A    Yes, sir.

25  Q    Okay.  Also, was there any cellular contact between a

1  robber who participated in this Houston robbery and Mr.

2  Riveron while Mr. Riveron was en route from Miami to Houston?

3  A    Yes, there was.

4  Q    Was there also any voice message that was left on a --

5  what's called a WhatsApp app --

6  A    Yes, sir.

7  Q    -- that relates to this transaction?

8  A    Yes, sir.

9  Q    And could you outline to the Court exactly what this is?

10 A    Yes, sir.  The WhatsApp account subscribed under the 702

11 area code number that James Tobar used for the robbery, and it

12 was consistent with the location of the robbery, who also had

13 a WhatsApp account.  He sent a voice message after the

14 robbery, after contacting Mr. Riveron, where he was -- after

15 he was contacted, he -- Mr. James Tobar sent a voice message

16 to another robber saying that he had contacted Kitty and that

17 he was on his way and that Kitty wanted to meet in Beaumont,

18 Texas but Mr. Tobar told him, no, you need to come to Houston.

19 Q    Okay.

20 A    Paraphrasing.

21 Q    And this call was made right after the robbery?

22 A    This was contemporaneous.  Yes, sir.

23 Q    Okay.  And the robbers who were selling these -- the

24 fruits of these robberies to the Defendant, did they indicate

25 that he knew exactly where these -- where this jewelry came

1    from?

2    A    Yes.  They knew they came from robberies and thefts.  He

3    knew -- he knew they were stolen property.

4    Q    Okay.  Now, although it's not alleged in the indictment,

5    was there another robbery that occurred of a jewelry salesman

6    in the Dallas/Fort Worth area on June the 9th of 2016?

7    A    Yes.

8    Q    What happened in that robbery?

9    A    During that robbery, the same robbers, some of which had

10   participated in the robberies we spoke of, conducted a robbery

11   of Mr. Mohammed Sheik, a jeweler who they identified who they

12   thought was a jewelry salesman, a traveling jewelry salesman.

13   They followed him to a gas station near the DFW airport, where

14   they robbed him, as he held onto the car because he was not

15   insured and his life savings was in that jewelry line.  He was

16   dragged for approximately two miles and died as a result of a

17   robbery.

18   Q    So he was killed?

19   A    Yes.

20   Q    And the participants in those robberies, in that

21   particular robbery, they were indicted?

22   A    Yes.

23   Q    Okay.  And did any those participants identify Mr. Riveron

24   as being someone who was involved in these circles?

25   A    Yes.

1  Q    What did they say?

2  A    He's a purchaser of stolen jewelry.

3  Q    Okay.  And was any participant in that deadly attack also

4  involved in any of the robberies in which he sold jewelry

5  directly to Mr. Riveron?

6  A    Yes.

7  Q    And who was that?

8  A    There are four participants that took part in that

9  robbery.  One female who did not know Mr. Riveron.

10  Q    Okay.

11  A    But all four claim they had done business with Mr.

12  Riveron.

13  Q    Okay.  And was one of them, in fact, a participant in that

14  Charlotte robbery?

15  A    Yes.

16  Q    Okay.  And one of them -- was another individual also a

17  participant in the Bedford robbery?

18  A    Yes.

19  Q    Okay.  After -- let me ask you:  Did you ever hear of a

20  man by the name of Juan Guadarrama?

21  A    Yes.

22  Q    Who is Juan Guadarrama?

23  A    Juan Guadarrama was an alleged associate of Mr. Riveron

24  who sold stolen jewelry -- I'm sorry, who purchased stolen

25  jewelry on his behalf and smuggled gold and gems on his

1    behalf.  He was arrested pursuant to an undercover operation

2    in the state of Florida in 2012.  He completed a sworn

3    statement alleging that he was doing a lot of business for Mr.

4    Riveron and that Mr. Riveron purchased the stolen jewelry from

5    Columbian nationals in the same fashion that he did.

6    Q    Okay.  And how far back does he put Mr. Riveron's criminal

7    conduct in fencing proceeds that are either stolen or the

8    fruits of robberies?

9    A    In the sworn affidavit, he puts him back at -- in the mid-

10   1990s, since the mid-1990s.

11   Q    Okay.  Does Mr. Riveron have any evidence of foreign

12   travel?

13   A    Yes.

14   Q    Since 2014, how many times has he traveled outside the

15   United States?

16   A    Approximately ten times.

17   Q    And where has he gone?

18   A    Various places.  Europe.  Places.  Italy, Germany, Panama,

19   Dominican Republic.  Just to name a few.

20   Q    Let me ask you this.  Going back to Mr. Guadarrama, did

21   Mr. Guadarrama say that this defendant, Mr. Riveron, would

22   take any evasive action if he thought that law enforcement

23   might be circling in on him?

24   A    Yes.  He alleged that at one point Mr. Riveron thought he

25   was being looked at or investigated by law enforcement and Mr.

1   Riveron fled to Italy for a short amount of time.  At another

2   point, he came back, realized he was still being looked at by

3   law enforcement -- he being Mr. Riveron -- and that Mr.

4   Riveron fled to Panama for approximately a year to establish

5   residence there.

6   Q   Okay.  Does that give you any concern that Mr. Riveron, if

7   released, would be a flight risk?

8   A   Yes.

9   Q   Does he receive any money wires from individuals in

10  foreign countries?

11  A   Yes.

12  Q   Now, Mr. Riveron was arrested in the Miami area, correct?

13  A   Yes, sir.

14  Q   And after his arrest, did you have an opportunity to

15  interview him?

16  A   Yes.

17  Q   Okay.  And did you advise him of his Miranda rights?

18  A   Yes.

19  Q   And did he agree to waive them and to at least begin

20  speaking with you?

21  A   Yes.

22  Q   Okay.  What did he tell you?  Did you -- when you informed

23  him about the nature of why he was being arrested?

24  A   In the interview, he alleged that he used to have two pawn

25  shops, one Cash on the Beach for several years, another one

1   Cash on Collins, which I believe still operates under his

2   name.  He alleged that 100 percent of the jewelry he obtains

3   through those pawn shops from the public.  That records are

4   maintained and the public's record is maintained in accordance

5   to an ordinance or policy.

6   Q    Uh-huh.

7   A    And that in order to sell the jewelry, he sells it to

8   either a dealer or refiners.  I asked him if he's ever

9   traveled to Texas -- Dallas, specifically.  He alleged that

10  his daughter resided in the Dallas area for approximately a

11  year around the time of the conspiracy, and that he also

12  traveled to the Dallas area and Houston with his wife to visit

13  some of his favorite restaurants.

14  Q    Did you ever ask him whether or not he traveled to Dallas

15  or to Houston or the Houston area -- or anywhere in Texas, as

16  a matter of fact -- in order to acquire jewelry?

17  A    Yes, I did.

18  Q    What did he say?

19  A    He said he's never purchased jewelry in the state of

20  Texas, traveling to the State of Texas or outside of Florida,

21  traveled to purchase any jewelry or diamonds outside of

22  Florida.

23  Q    Okay.  By the way, did he confirm that the cell phone

24  number that we've been discussing that is attributable to him,

25  that that was, in fact, his cell number?

1  A    Yes.

2  Q    Okay.

3  A    He did say, also, I'll add, that sometimes in jewelry

4  shows he buys jewelry from dealers.  However, those

5  transactions are all documented when you go to a dealer.

6  Q    Okay.  During the course of this investigation, did an

7  individual by the name of Freddie Baez ever come up?

8  A    Yes.

9  Q    Who is Freddie Baez?

10  A    Freddie Baez is a known jewelry fence who resides in

11  Bogota, Columbia.

12  Q    Okay.  To your knowledge, does he have any connections

13  with the Defendant, Mr. Riveron?

14  A    Yes.

15  Q    How is that?

16  A    There's title transfers that Freddie Baez and the

17  Defendant, in his record, that show his name as Freddie Baez.

18  Also, criminally speaking, the Defendant, when some of these

19  robbers elect to be paid in Columbia, Mr. Riveron uses Mr.

20  Freddie Baez to pay those robbers.

21  Q    Okay.  Do you have a concern, any concern whether or not

22  this Defendant -- I know you've already said that you believe

23  that he is a flight risk, correct?

24  A    Yes.

25  Q    Do you have any reason to believe that he would pose a

1    danger to the community?

2    A    I do.

3    Q    Why is that?

4    A    Well, I believe Mr. Riveron creates a market for violent

5    robbers to commit high-risk robberies, and in our

6    investigation one of which resulted in the death of a jeweler,

7    and multiple have resulted in stabbings, one of which required

8    surgery and overnight stays in hospitals.  Only a handful of

9    people can create a market for such property that's stolen,

10   turning diamonds into cash.  Mr. Riveron is positioned in a

11   fashion that he can create that market.

12   Q    Okay.  And as you said, that even results in deadly

13   conduct?

14   A    Correct.

15   Q    Okay.

16        MR. TROMBLAY:  That's all that I have, Your Honor.

17        THE COURT:  Thank you.

18                        CROSS-EXAMINATION

19   BY MR. POE:

20   Q    Agent, you went through four different robberies that you

21   have linked to Mr. Riveron; is that right?

22   A    Yes, sir.

23   Q    Okay.  The first one you talked about was the Bedford

24   robbery that occurred in August of 2015, over four years ago.

25   Is that right?

1   A    No.

2   Q    Well, it was the first one you talked about here, the --

3   A    It's August 2014.

4   Q    2014?  All right.  So it's almost six years ago?

5   A    Five years ago, sir.

6   Q    And during that one, do you have any evidence that Mr.

7   Riveron was a part of planning that robbery?

8   A    No, sir.

9   Q    Okay.  Any evidence that he financed that robbery in order

10  to make it occur?  Or targeted it?

11  A    Not that he financed that robbery, no, sir.

12  Q    Okay.  Basically, the only evidence you have linking him

13  to that robbery is him purchasing the stolen good afterwards;

14  is that correct?

15  A    Yes, sir.

16  Q    Okay.  Now, you indicated that these -- the robbers would

17  say that they would call him and they'd let him know that this

18  stuff is stolen.  Did they let him know that it was stolen

19  goods or that it came from the result of a robbery?

20  A    Sir, the robbers have alleged multiple occasions where

21  they've spoken to Mr. Riveron while negotiations were taking

22  place, one of which has alleged speaking about the actual

23  robbery and what happened and Mr. Riveron laughing about it

24  and saying, I don't want to know what you do because I know

25  what you do.

1  Q    Okay.  And then the second one that you talked about was

2  from Oklahoma City in September of 2014.  So that would have

3  been a month after the Bedford one; is that correct?

4  A    Yes, sir.

5  Q    All right.  In that one, any evidence that Mr. Riveron was

6  a part of the planning of that robbery?

7  A    No, sir.

8  Q    So the only evidence you have of that one is that he

9  purchased the stolen goods after the robbery had been

10  completed?

11  A    Yes, sir.

12  Q    And then the next robbery you talked about was from

13  Charlotte in October of 2014.  So, again, a month after the

14  Oklahoma City one; is that right?

15  A    Yes.

16  Q    And then, that one, do you have any evidence that he

17  helped plan that robbery?

18  A    No, sir.

19  Q    So the only evidence you have is that he purchased stolen

20  goods after the robbery had been completed?

21  A    Yes, sir.

22  Q    And then the last robbery you discussed was from Houston.

23  And is that July of 2015?

24  A    Yes, sir.

25  Q    Okay.  And in that one, do you have any evidence that he

1   planned that robbery?

2   A    No, sir.

3   Q    So the only evidence you have is that he purchased stolen

4   goods after the robbery had been completed?

5   A    Yes.

6   Q    All right.  Now, you arrested 20 different individuals

7   that were -- that you have classified or called robbers; is

8   that right?

9   A    Yes.

10  Q    And these individuals would sometimes work -- or, how big

11  were the crews that they had for these robberies?

12  A    Anywhere between three and seven.

13  Q    Okay.  So three to seven?  So, with 20 individuals,

14  sometimes they would use individuals for one robbery or

15  different combinations of people would be used for different

16  robberies; is that right?

17  A    Yes, sir.

18  Q    How many robberies did you identify that these 20

19  individuals have done?

20  A    Approximate -- between 14 and 16 robberies.

21  Q    So, of the 14 and 16 robberies, you have four robberies

22  that Mr. Riveron purchased stolen goods from; is that correct?

23  A    Yes, sir.

24  Q    Okay.  And he hasn't -- and when was the last robbery that

25  you have that these 20 people or anybody in this 20 group of

1   people participated in?

2   A    So, they contacted him, through statements provided by

3   cooperators, in May of 2016 to sell stolen watches of a

4   robbery, I'm sorry, of a theft, and he declined to buy those

5   because he wanted to know details of those robberies or of the

6   watches.  But actual purchasing, I would say July of 2015 in

7   the -- alleged in the indictment.

8   Q    Okay.  Maybe you misunderstood my question.  When's the

9   last robbery that you have that anybody in the group of the 20

10  robbers that you've indicted participated in?

11  A    June 9th, 2016.

12  Q    Okay.  So, June 9th, 2016.  And you don't have any

13  evidence that you can sit here and testify to today that Mr.

14  Riveron was purchasing stolen goods from any other robberies

15  since July of 2015; is that right?

16  A    Yes, sir.

17  Q    Okay.  I'm sorry.  Yes, you have any evidence, or yes, you

18  don't have any evidence?

19  A    No.  Your question, in order for a negative response,

20  required yes.  So, yes, I don't have any evidence.

21  Q    Okay.  I'm just making sure that I'm clear on that.

22  A    Not a problem.  No problem.

23  Q    All right.  And now, the four robberies, I just want to

24  concentrate on the four ones that you just mentioned that Mr.

25  Riveron was a part of.  The Bedford one.  You said that the

 1   salesman had been robbed at gunpoint, but then you add a

 2   clarifier in there of what he believed to be at gunpoint?

 3   A    Correct.

 4   Q    Were actual guns used during that robbery?

 5   A    During that robbery, we don't have any evidence an actual

 6   gun was used.

 7   Q    Okay.

 8   A    And we've noticed -- we've -- in the -- and there's two

 9   indictments, to be clear.

10   Q    Okay.

11   A    The indictment that includes 15 robbers, they were using

12   BB guns and knives.  And center punches.  The indictment that

13   includes five robbers, they were using real firearms.

14   Q    All right.  The one they used the real firearms, --

15   A    Right.

16   Q    -- are those individuals tied to the four robberies that

17   we talked about Mr. --

18   A    Yes.

19   Q    Okay.  All right.  So, looking at the -- so, you don't

20   have any evidence that a real gun was used in the Bedford

21   robbery?

22   A    Correct.

23   Q    Okay.  But the Oklahoma City robbery, you said either a

24   knife or at gunpoint?

25   A    Or what -- of what the victim believed was at gunpoint,

1    yes.

2    Q    Okay.  Do you have any evidence to suggest it was a real

3    firearm --

4    A    No, --

5    Q    -- during that robbery?

6    A    -- I do not.

7    Q    All right.  And then the Charlotte, North Carolina

8    robbery, I thought I heard you say that the victim actually

9    fired shots at the robbers; is that right?

10   A    No, sir.  A witness who observed the robbery brandished

11   his personal firearm and fired at the robbers as they fled the

12   scene, not the --

13   Q    Okay.  Any evidence that the robbers in the Charlotte,

14   North Carolina robbery had an actual firearm that they used

15   there?

16   A    No, sir.  No evidence.

17   Q    All right.  And then the Houston robbery from July of

18   2015, the last one that you mentioned that Mr. Riveron was a

19   part of or purchased stolen goods from, any evidence that an

20   actual firearm was used during that robbery?

21   A    No, sir.

22   Q    All right.  So the four robberies that he purchased stolen

23   goods from, you don't have any evidence that an actual firearm

24   was used during that one?

25   A    Correct.

1    Q    Okay.  Now, the information about Mr. Riveron's travel, I

2    mean, have -- where did you get the information about he went

3    to Panama to establish residency there for a year?

4    A    That was alleged in the sworn affidavit completed by Mr.

5    Guadarrama in 2013, in January.

6    Q    Okay.  And what year was it that he supposedly established

7    that residency in Panama?

8    A    It wasn't clear because he didn't indicate a year.  He

9    said at some point before he was arrested.

10   Q    Okay.

11   A    Mr. Guadarrama.

12   Q    And so when you -- were you a part of the arrest of Mr.

13   Riveron?

14   A    Yes.

15   Q    Okay.  And whenever you arrested him, did he have a

16   passport nearby or did you ask for a passport?

17   A    We did not ask and we did not observe one.

18   Q    Okay.  Would you be surprised to know that there is --

19   during 2013, there's times when he's traveling to multiple

20   counties, he's got stamps in his passport?

21   A    No, I would not be surprised to know that.

22   Q    Okay.  And during the time in which he's traveling to

23   Europe and these other countries, I mean, he had no travel

24   restrictions on him; is that correct?

25   A    Correct.

1    Q    I mean, he has no criminal history?

2    A    Correct.  No criminal history.

3    Q    Okay.  And so the -- when you interviewed him following

4    his arrest, you said that he claimed that he never had

5    purchased any jewelry outside of the state of Florida.  Did

6    you give him any time frames in which you're asking these

7    questions on?

8    A    No.

9    Q    Okay.  So let me just be fair.  What did you do four years

10   ago in July?  What were you doing?

11   A    I'd have to think about it.  It would take a little while

12   for me to under --

13   Q    Okay.  So, --

14   A    -- figure it out.

15   Q    Would you agree that if you've just been arrested --

16   A    Uh-huh.

17   Q    -- by the FBI and they've read you your Miranda warning

18   and you're being questioned and they're just throwing all

19   these questions out at you, is it possible that he could

20   forget about something that occurred four and five years

21   before?

22   A    It's possible, given the circ...

23   Q    Okay.

24   A    Given reasons for travel, purchasing jewelry line, that

25   would be something that would stand up in my mind, but it's

1  possible that he would forget, yes.

2  Q    Okay.  All right.  And so your -- right now, your basis

3  for the fact that he's a flight risk is this individual that

4  claims that he made some comment that he would flee the

5  country back in 2012 or 2013; is that right?

6  A    Not entirely correct.  The alleged -- the alleged -- what

7  -- Mr. Guadarrama alleges that he did flee the country when he

8  thought he was being looked at.  Not that he would say he

9  would; that he actually did flee the country.

10  Q    Okay.  Are you aware that Mr. Riveron has a substantial

11  amount of assets in the Miami area?

12  A    Yes.

13  Q    Okay.  Including rental properties and businesses?

14  A    Yes.

15  Q    Okay.  Are you aware that his family is all in the Miami

16  area?

17  A    Yes.

18  Q    Okay.  So it would be out of the ordinary for him to flee

19  to someplace like Italy for -- if he thought he was in

20  trouble?

21  A    I'm not aware of what's going on in his mind.  I'm just

22  going after what a close associate claimed that he's done.

23  Q    Okay.

24  A    But, yes, it -- it would be a tough decision.

25           MR. POE:  All right.  I'll pass the witness.

1          THE COURT:  Thank you.

2          MR. TROMBLAY:  I have nothing else.

3          THE COURT:  Thank you very much for being here today.

4          THE WITNESS:  Thank you, Your Honor.

5     (The witness steps down.)

6          MR. TROMBLAY:  And I have no other witnesses.

7          THE COURT:  Thank you.

8          MR. POE:  I'd call Sandra Virgin.  Riveron, I'm

9   sorry.

10          THE COURT:  Ma'am?

11          SANDRA DIAZ RIVERON, DEFENDANT'S WITNESS, SWORN

12          THE COURT:  Thank you.  Have a seat.

13                    DIRECT EXAMINATION

14   BY MR. TROMBLAY:

15   Q    Ma'am, will you please state your name for the record?

16   A    Sandra Diaz Riveron.

17   Q    And, ma'am, are you the wife of Romelio Riveron?

18   A    Yes, I am.

19   Q    Okay.  The same individual that's sitting here in the

20   orange jumpsuit; is that correct?

21   A    Yes.

22   Q    Okay.  How long have you been married?

23   A    For about three years.

24   Q    Okay.  And were you guys together before you were married?

25   A    Yes.

```
 1   Q    Okay.  How long?

 2   A    About nine years.

 3   Q    Okay.  Do you have kids together?

 4   A    No.

 5   Q    Okay.

 6   A    Well, we -- we have three girls.  Two of mine and one of

 7   his.

 8   Q    Okay.  So two girls that you had from a previous

 9   relationship; is that right?

10   A    Correct.

11   Q    And then one that he has from a previous relationship?

12   A    Correct.

13   Q    What are their ages?

14   A    21, 27, and 28.

15   Q    Okay.  Does he treat each of the girls, whether it's one

16   that was biologically his or yours, does he treat them all the

17   same?

18   A    Yes.

19   Q    Okay.  Does he help them financially?

20   A    Yes, he does.

21   Q    How so?

22   A    He -- my oldest daughter goes to the university, so he

23   pays all her expenses.  He also helped my youngest daughter

24   with some of her expenses.  And his oldest daughter is --

25   whenever she needs him, he's always there.  But she, you know,
```

```
 1    she has a good job, is pretty much on her own.

 2    Q    Now, do you work outside the home?

 3    A    I'm unemployed right now.

 4    Q    Okay.  And do you take care of a mother, your mother, who

 5    has some health issues?

 6    A    Yes, I do.

 7    Q    Okay.  Does Romelio help with taking care of her

 8    financially?

 9    A    Yes.

10    Q    Okay.  In addition to, I guess, taking care of his -- the

11    daughters and your mother, does he have other family there in

12    the Miami area?

13    A    Yes, he does.

14    Q    Okay.  Would you say he has a considerable amount of

15    family?

16    A    Yes.

17    Q    Okay.  How many people, would you say?

18    A    It's a large family.  A lot of cousins, aunts, his

19    parents, his daughter.

20    Q    Okay.

21    A    A large amount of family.

22    Q    Now, Romelio is not originally from the United States; is

23    that correct?

24    A    Correct.

25    Q    Where is he from?
```

```
 1   A    Cuba.

 2   Q    Okay.  When did he flee Cuba?

 3   A    When he was about nine years old.

 4   Q    Okay.  And why did they flee Cuba?

 5   A    Well, his dad was a political prisoner and they left to

 6   Costa Rica.

 7   Q    Okay.  And then, eventually, after getting to Costa Rica,

 8   they made it to the United States; is that right?

 9   A    Correct.

10   Q    And has he been a United States citizen for over 30 years?

11   A    Yes.

12   Q    Okay.  Does he have a business in the Miami area?

13   A    Yes.

14   Q    What kind of business?

15   A    It's a jewelry store/pawn shop.

16   Q    Okay.  And is it a large business?

17   A    Um, --

18   Q    Meaning, does it have a lot of employees?

19   A    No.

20   Q    Okay.  How many employees does it have right now?

21   A    Just one that I'm aware of.  Just one.

22   Q    Okay.  And is that individual, is she capable of running

23   the business by herself?

24   A    Not that I'm aware of.

25   Q    Well, is she even on the accounts, the business accounts,
```

1  to be able to write checks and pay the bills for the business?

2  A    No, she's not.

3  Q    Is -- when Romelio is in town, or, I guess, not in

4  custody, is she constantly calling him, if he's not in the

5  shop with her, asking questions about different things that

6  people are trying to sell to them?  Values?

7  A    Yes.

8  Q    Is she constantly relying on Romelio in order for that

9  business to survive?

10  A    Yes.

11  Q    If Romelio is not released, would you -- do you expect

12  that that business is going to be able to stay afloat for very

13  long?

14  A    No.

15  Q    Okay.  In addition to that, does Romelio have several

16  rental properties in which he manages?

17  A    Yes.

18  Q    Does he have a property manager that manages them?

19  A    No.

20  Q    Okay.  So he's in charge of taking care of if there's an

21  issue with the plumbing, electrical issues, or obtaining rents

22  and paying bills associated those; is that correct?

23  A    That's correct.

24  Q    Okay.  Do you know anything about his business affairs to

25  be able to take that over for him?

```
 1   A    No.

 2   Q    Okay.  So, without him there to help run that, those could

 3   potentially go into default in some form; is that correct?

 4   A    I would believe so.

 5   Q    All right.  Now, you've -- you and Romelio have traveled

 6   some; is that right?

 7   A    Yes.

 8   Q    Okay.  We heard from the agent that you attended a trip or

 9   went on a trip to Oklahoma City back in 2015; is that right?

10   A    Yes.

11   Q    Do you even recall that trip?

12   A    No, I don't.

13   Q    Okay.  You're not saying you didn't go?

14   A    Right.

15   Q    You just don't recall it.  Is that right?

16   A    Correct.

17   Q    Okay.  And you've traveled with him before?

18   A    Yes.

19   Q    Okay.  Traveled with him to some jewelry shows or fairs?

20   A    Well, I didn't go personally, but I've overheard him say

21   that that's one of the reasons why -- the reason for the

22   travel.

23   Q    Okay.  And the times that you've traveled with him, have

24   you ever traveled with him where he's carried a large sum of

25   cash?
```

1    A    No, never.

2    Q    Okay.  Have you ever traveled with him in which he's gone

3    and purchased a lot of jewelry from somebody and then traveled

4    back to Miami with you?

5    A    Never.

6    Q    Not that you recall?

7    A    Right.

8    Q    Okay.  Now, you have two different homes; is that correct?

9    A    Correct.

10   Q    You have one in Miami-Dade County; is that right?

11   A    Correct.

12   Q    Is that your primary residence?

13   A    We go back and forth, but yes.

14   Q    Okay.  And then you have another home in Key Largo; is

15   that right?

16   A    Correct.

17   Q    Is Key Largo in a different county than Miami-Dade County?

18   A    Yes, it is.

19   Q    Okay.  And what county is that?

20   A    Monroe.

21   Q    Monroe?  And at the home in Key Largo, do you actually

22   have a boat?

23   A    Yes, we do.

24   Q    Okay.  And so a lot of the travel that Romelio has, to the

25   Bahamas and some of these other islands, that's via the boat;

1    is that correct?

2    A    Correct.

3    Q    Okay.  If the Court was to confine him to Miami-Dade

4    County with an ankle monitor that would track where his every

5    movement was, would that allow him to conduct all of his

6    business with managing his rental properties and his jewelry

7    store and taking care of his family?

8    A    Yes.

9    Q    Okay.  Is there any need for him to go to the Key Largo

10   property while this case is pending, that you're aware of?

11   A    No.

12   Q    Okay.  And in addition to just yourself being here, do you

13   have some other family members who are here today in support

14   of Romelio?

15   A    Yes.

16   Q    Who's all here?

17   A    My youngest daughter, Romelio's stepmother and father.

18   Q    Okay.  And so would you say that he has a significant

19   amount of connections to the Miami area?

20   A    Yes, absolutely.

21   Q    Okay.  And do you believe that he's a danger to the

22   community?

23   A    Not at all.

24   Q    Why do you say that?

25   A    He's never committed a crime and he's a good man.

1   Q    Okay.

2   A    Family man.

3   Q    All right.

4          MR. TROMBLAY:  I'll pass the witness.

5          THE COURT:  Thank you.

6                     CROSS-EXAMINATION

7   BY MR. POE:

8   Q    Ms. Riveron, you said that you've been married to this

9   Defendant for three years, and that prior to that you had been

10  dating him for nine years.  Is that correct?

11  A    Approximately, yes.

12  Q    So you've known him for 12 years --

13  A    Correct.

14  Q    -- total?

15  A    Correct.

16  Q    Okay.  You've known him 12 years very well, correct?

17  A    Correct.

18  Q    Okay.  And you've -- let me go back.  In late September of

19  2014, you don't recall flying from Miami to Dallas, Texas, and

20  staying at the Omni Hotel?

21  A    I've been to Dallas before, but I don't recall that exact

22  trip.  No, I don't remember.

23  Q    You don't remember taking a trip from -- flying with your

24  husband from Miami to Dallas and staying at the Omni Hotel?

25  A    I remember being in Dallas before, but I don't remember

1    that exact trip.

2    Q    And do you remember the very next day flying from Dallas

3    to Oklahoma City and staying at the Colcord Hotel there?

4    A    No, I do not.

5    Q    You have no idea?

6    A    I don't remember.

7    Q    While you all were staying at the Colcord, do you recall

8    your husband having a meeting with anybody?

9    A    No, I do not.

10   Q    Do you have any idea why you even went to Oklahoma City?

11   A    I can't remember.  I think --

12   Q    You don't remember why you went to Oklahoma City?

13   A    No.  Just to visit.  I don't remember.

14   Q    Do you have family in Oklahoma City?

15   A    No, I do not.

16   Q    Is anything in Oklahoma City that would stand out that you

17   would want to go see in Oklahoma City?

18   A    We like to travel and go to restaurants.

19   Q    Did your husband ever mention that, oh, by the way, I'm

20   going to pick up some jewelry?

21   A    No, he's -- I don't recall him ever saying that.

22   Q    You don't recall any jewelry being the subject matter of

23   his trip to Oklahoma City?

24   A    No.  I -- he may have gone to a watch fair or a jewelry

25   fair, but I never attended those.

1    Q    Okay.  Did you know that he was buying jewelry that had

2    been the proceeds of robberies?

3    A    Absolutely not.

4    Q    That would be a big surprise to you?

5    A    Yes, it would.

6    Q    So if that statement were true, would it be of any

7    surprise that there may be some things about your husband that

8    you don't know about?

9    A    I really don't want to speculate.

10   Q    Okay.  Fair enough.

11           MR. TROMBLAY:  That's all I have.

12           THE COURT:  Thank you.

13           MR. POE:  Just real briefly, Your Honor.

14                        REDIRECT EXAMINATION

15   BY MR. POE:

16   Q    Ms. Riveron, if the judge was to grant release here, would

17   you ensure that Romelio showed up for court, all of his court

18   appearances?

19   A    Absolutely.

20   Q    Would you ensure that he abide by every -- all the

21   conditions that the Court might set?

22   A    Absolutely.

23   Q    And if he was to violate any of those, would you be

24   willing to call and report him to his probation officer or to

25   the Court?

1    A    Yes, sir.

2    Q    Okay.

3            MR. TROMBLAY:  Nothing further.

4            THE COURT:  Thank you.  You can step down.

5        (The witness steps down.)

6            MR. POE:  Your Honor, I have no further witnesses at

7    this point, but I would like to proffer some evidence.

8            THE COURT:  Okay.

9            MR. POE:  I have Mr. Riveron's passport here with me

10   and which I can tender to the Court for inspection that we

11   have every intention of providing to the Court if you were to

12   grant release.  But you can see the stamps in here in which

13   he's traveling a lot of different places in 2012 and 2013, in

14   which he's going in and out of different countries, all of

15   which would suggest that this cooperator was either

16   exaggerating or just completely making something up about

17   where he was trying to establish residence or where he was

18   going.  And so -- but as far as evidence goes, I don't have

19   anything further, Your Honor.

20       Would the Court like to see the stamps or --

21            THE COURT:  Sure.  So you're saying that the passport

22   is evidence that he's not trying to establish a residence in

23   Panama because he's not going to Panama?

24            MR. POE:  Well, I'm not saying -- you can see stamps

25   in here from Panama, but he's -- obviously, he's leaving --

1  he's going there and he's leaving.  So you've got a stamp from

2  September 12th of 2013 in Panama and then you have one from

3  May of 2012, you've got another one from March of 2013,

4  there's an August of 2012.  There's two, actually, within a

5  week apart from each other in Panama in 2012 of August.  And

6  then there's stamps in here from the Bahamas and then other

7  places.

8      So it would suggest that he's not fleeing to a particular

9  country and staying.  He's traveling.  He has a boat.  He's

10  moving all around.  So that's just the only point that I'm

11  trying to make with the passport, Your Honor.  So, --

12          THE COURT:  Okay.

13          MR. POE:  -- but other than that, I have argument.

14          THE COURT:  Okay.  Well, since it's the Government's

15  motion, I'll let Mr. Tromblay argue first.

16          MR. TROMBLAY:  Yes, Your Honor.  Your Honor, the

17  Defendant has been indicated for conspiracy to commit money

18  laundering.  And as the Court is now aware, the backdrop to

19  that case is that the Defendant was a known fence for people

20  who were robbing traveling jewelry salesmen, attacking them

21  with either BB pistols, real firearms, knives, whatever.  But

22  in any event, they were hurt.  This was dangerous conduct that

23  underlies these charges.  In fact, this is anything but

24  child's play, because, in fact, as Special Agent Gimenez even

25  recounted, one of the -- two of the participants who were

 1   involved with him in other robberies participated in an event

 2   in the Dallas/Fort Worth area in which a traveling jeweler was

 3   killed as a result of this conduct.

 4        So, suffice it to say that this is dangerous conduct, and

 5   this Defendant, as Special Agent Gimenez recounted, he creates

 6   a market for this very type of conduct.  Without a fence, it

 7   does no good for them to rob, assault, and even kill traveling

 8   jewelry salesmen.

 9        Nonetheless, his conduct also indicates that he is also a

10   flight risk.  According to what Special Agent Gimenez said, an

11   associate of his who goes back to the mid-1990s recounts that

12   he has been engaged in this very type of conduct going back

13   more than 20 years, to the mid-'90s, where he has smuggled

14   jewelry for him, he has handled stolen jewelry for him.  And,

15   in fact, this Defendant, it's just the tip of the iceberg for

16   what he has been indicted for, is simply a continuation of

17   that very type of conduct.  He has extensive travel.  And

18   also, too, the individual who was an associate with him

19   indicated that, in fact, he did, in fact, flee the country

20   whenever he thought that he was under suspicion by law

21   enforcement.

22        Considering this, considering the amount of assets that he

23   has, considering the circumstances surrounding this, not only

24   is he a danger to the community but he is also a flight risk.

25   And based upon that, we submit that there are no conditions or

1   set of conditions that would either protect the public from

2   his conduct or assure his appearance as required.  And we

3   would respectfully ask that this Court detain him based upon

4   the evidence that has been presented and also the evidence

5   that's outlined in the presentence report.

6           THE COURT:  Thank you.  The Pretrial Services report?

7           MR. TROMBLAY:  The Pretrial Services report.  I

8   apologize.

9           THE COURT:  Thank you.

10          MR. POE:  Your Honor, I'd like to point out the fact

11  that if this individual who's an associate of his since the

12  mid-'90s was such a credible witness, then he would have been

13  charged long ago for purchasing stolen goods or smuggling

14  stolen goods.  But, instead, the Government wants to rely on

15  the fact and uses their argument here today that he creates

16  this market for these robbers, a market in which he hasn't --

17  there's no evidence that he's participated in since at least

18  July of 2015, which is almost -- or, is over four years ago.

19  In fact, the last time that one of these robbers tried to

20  contact him to sell stuff, he declined.

21      So the question is, is he -- they want to talk about these

22  robberies, but yet Mr. Riveron has not actually participated

23  in robberies.  He's just purchasing stolen goods from -- at

24  best, if we take what their evidence is at face value.

25      So, the -- at the end of the day, is can this Court find

1   conditions in which to ensure that he's not a danger to the

2   community and he's not a flight risk?

3       You know, people all day long purchase items off the

4   street, and I don't believe that there's any market that he's

5   created in the last four years that they have evidence of to

6   suggest that he's a danger to the community.

7       But then when you look at the flight risk, the issues with

8   the -- even the Pretrial Services report, if you take judicial

9   notice of that, it recommends release.  It recommends there

10  are conditions of release that would ensure the safety.

11      Your Honor, we have his passport here that we can provide

12  to the Court that would alleviate any concerns about travel.

13  He's a U.S. citizen.  If you were to confine him to Miami-Dade

14  County, which is where his businesses are, his rental

15  properties and his home, it would alleviate any concern with

16  him having access to his boat and his home in Key Largo.

17      And so, for those reasons, we would -- we believe that

18  there are conditions that you can set, combined with the fact

19  that his whole life is in the Miami community.  His family is

20  there.  His businesses are there.  I mean, it's not like he --

21  I mean, he fled Cuba because his father was a political

22  prisoner.  And so when you look at the totality of the

23  circumstances here, I believe the Court's -- the Government

24  has failed to prove by clear and convincing evidence, which is

25  a high burden, to show that he is a flight risk and a danger

1    to the community.  For those reasons, we would ask --

2           THE COURT:  Well, the Government only has to prove

3    danger by clear and convincing evidence.  The burden on the

4    flight question is lower.

5           MR. POE:  Okay.

6           THE COURT:  Oh, I'm sorry, the -- the burden on --

7    the burden is not clear and convincing evidence as to both

8    questions, correct?

9           MR. POE:  I was of the understanding that 3142, I

10   believe, is -- it requires it for both, but especially since

11   this is not a presumption case.

12          THE COURT:  It's not a presumption case, that's

13   correct.  But even when it's not a presumption case, --

14          MR. POE:  I believed it was clear and convincing, but

15   I -- I could stand to be wrong.  So, --

16          MR. TROMBLAY:  We only have to prove -- we only have

17   to prove flight risk by a preponderance of the evidence.

18          MR. POE:  So.  But, well, the flight, I mean, on that

19   one, Your Honor, we've -- you could put an ankle monitor on

20   this man and you could let him stay in Miami-Dade County or to

21   be able to come to the Northern District of Texas and that

22   would satisfy -- there's a condition there that he can ensure

23   that he's not going to be a flight -- I mean, he -- all of his

24   assets, whether his businesses are there, I mean, there's --

25   his family is there.

1    For those reasons, we'd ask that you would grant him

2  release.

3         THE COURT:  Thank you.  I am going to grant the

4  Government's motion.  I find that they have established by a

5  preponderance of the evidence that there are no conditions or

6  combination of conditions that I could set that would

7  reasonably assure his appearance as required.  The Defendant

8  has a lot of assets that are not accounted for.  He has a

9  boat.  He has extensive travel.  And there was credible

10  evidence adduced at the hearing that the Defendant left the

11  country before when he thought he was being looked at by law

12  enforcement for his participation in the offenses that are

13  alleged in the indictment.

14    So, for those reasons, the Government's motion is granted.

15  And we are adjourned.

16         THE CLERK:  All rise.

17    (Proceedings concluded at 2:28 p.m.)

18                    --oOo--

19                   CERTIFICATE

20    I certify that the foregoing is a correct transcript from
   the digital sound recording of the proceedings in the above-
21  entitled matter.

22  **/s/ Kathy Rehling**                    09/18/2019

23  _____    _____

24  Kathy Rehling, CETD-444                    Date
   Certified Electronic Court Transcriber
25

```
 1                              INDEX

 2   PROCEEDINGS                                              2

 3   WITNESSES

 4   Government's Witnesses   Direct  Cross  Redirect  Recross

 5   Dan Gimenez                2      23

 6   Defendant's Witnesses    Direct  Cross  Redirect  Recross

 7   Sandra Diaz Riveron        33     41       43

 8   EXHIBITS

 9   -none-

10   RULINGS                                                50

11   END OF PROCEEDINGS                                     50

12   INDEX                                                  51

13
```